Bond v. Marriott International, Mr. Frederick. Thank you, Judge Shedd. May it please the Court, David Frederick for the beneficiaries. The District Court's ruling on the merits of the Top Hat Plan should be reversed and its ruling on the statute of limitations of our claim should be affirmed. Before addressing the statute of limitations arguments, I would like to make three quick points about the Top Hat Plan. First, the scope and breadth of Marriott's Top Hat Plan appears to be unprecedented. It encompasses thousands more employees than any Top Hat Plan in any reported case. Second, Marriott's plan covered mostly low to mid-level employees who were not part of a select group of management or highly compensated employees under any reasonable definition of those terms. And three, Marriott's plan violates ERISA's purposes of protecting workers because it took away ERISA's vesting requirements and protections from low-level workers who lacked the power to fend for themselves. Now on the statute of limitations question, let me address a couple of key points. Number one, ERISA's disclosure requirements are designed to provide a remedial scheme that's predicated on two critical functions. One is to have a claims procedure process that the trustee of the ERISA plan has designed so that people who feel like they've been agreed can have a claims procedure process. Marriott never created one for decades and did not create one until 2010. Under this Court's Rodriguez and White decisions, the statute of limitations question ought to be easy because there was no formal denial. Let me ask, do you think under Cotter there has to be a formal denial? Yes. The first part of Cotter reaffirms the Rodriguez rule. I know that, but did you have a formal denial there? The Court did not run the statute of limitations in Cotter from a formal denial. Correct, because it was unclear in that case whether there had actually been a claims procedure. But the second part of Cotter's holding was that because the beneficiary had been in a company's representative, conceded that the company had violated ERISA's benefits, the Court then said, because the beneficiary brought his ... Let me ask you this. Let me ask you this. Do you think anybody under ERISA, short of having a formal claim denied, could they ever learn something or be told something under which they would then know that they have to do something? In other words, the company would go, I'm telling you employees something, we've got a retirement plan. You ain't in it. It's not going to invest. You have no right. And if you don't like it, you can walk. Did that put you on notice? Conceivably, yes. And there are cases where they have applied this clear repudiation standard, and we addressed that comprehensively in our brief. But even in Cotter, where there was ostensibly a clear repudiation, even there the Fourth Circuit held that the beneficiary's claims were not time barred, even though it had been brought many, many years after the denial of the benefits. Here, there has been no clear repudiation. Could there be anything other than a clear repudiation that puts you on notice that you better check into it, sort of inquiry notice? ERISA, what Rodriguez said ... I'm just asking you, is that possible? I don't think so under ERISA. And what Judge Wilkinson explained in the Rodriguez opinion was that laypersons should not be put to the test of trying to figure out these complex provisions. And when he said in white that the formal denial rule ... I'm suggesting, though, that the information given to the layperson is pretty clear. We don't ... There's something called ERISA. You think you get retirement benefits, you ain't getting them, period. Would that give them notice? That would be closer, Judge Shedd. But here, the second part, remember I said the first part of the notice provision was having a claims procedure, which they didn't have? The second part of ERISA's disclosure requirements are to have a summary plan document that explains to the beneficiaries, here's what your rights are, here's what you're vesting ... Is that necessary? Yes. For a statute of limitations question? I do, because what many of the cases have held is that if ... What if your plan is not under ERISA? And your assertion is, you don't get an ERISA plan summary because we exempt from ERISA. Well, that's a breach of contract case. That's a different case. No, no. I'm talking about for statute of limitations. Well, then you would apply the contract term. Yeah, that's a contract case, Judge Shedd. No, no. I'm talking about for statute of limitations. I understand. I understand. I'm telling you that the answer is a breach of contract case has a breach of contract limitations, period. Here under ERISA, what this court has held is that because beneficiaries are getting benefits in their retirement, decades often after they first vested them, the views about these limitations periods are more elastic in order to benefit the beneficiaries to give them the benefits that Congress said they wanted. And here, what Mr. Bond experienced was to work at this company for 16 years, but after that his benefits had only partially vested by about less than 50%. And so he had worked longer than what the statute said his vesting requirements would have allowed, and he's denied the benefits of these stock plans that would have given him stock that he could use in his retirement. Rudder, you said that the reason why this is an easy case on the statute of limitations is because there was no claims procedure in place until, I think you said, 2010. Correct. And so there was no ability for your clients to file a claim. But is this really the kind of case that is suitable for a claims process? I mean, the allegation here is that the plan is illegal because it failed to comply with ERISA. So we're not really dealing with a claim, per se, are we? Well, we are and we aren't. We are in the sense that what we're asking for is that if these are benefits that are cognizable under ERISA, they should be under a plan that you should have a claims process. And the benefit of having a claims process is that it puts beneficiaries on notice of what their rights are. You know you've got a certain amount of time in which to bring a claim. That's a good thing, but is it necessary is the question. Yes. It is necessary because... And what law says that? That's just your argument? No. The statute says that. The statute says that ERISA has to give you a summary plan document and a claims process. It exempts top hat plans from the summary plan document only if they have filed the appropriate notifications with the Department of Labor. Here, Marriott kind of operated in this fog for decades. But it's not a question of... But if somebody knew from the get-go what you know now about it, why wouldn't that trigger a statute of limitations? It might, but the evidence here and all of the facts here point to the fact that those facts don't exist. So all I'm saying is that, Judge Shedd, all I'm saying is that if you want to decide this very complicated case on the simple ground, you do it under the formal denial rule while reserving the fact that they had no claims process here. I didn't ask you the simple ground. I'm talking about what's an applicable ground. I didn't say simple ground. And I was exploring with you, was it possible that something other than the formal denial or clear repudiation might put you on notice that you at least have a claim which might trigger the statute of limitations? Yes. And I've already said that. It would. Yes. It would. But you have to have notice of your injury. And your injury here is the application of very complicated statutory provisions. What about your interest here won't vest? That kind of notice, if that had been given, which wasn't here, that might be sufficient under some courts of appeals that adopt a clear repudiation standard. But our point, and by simply saying it's the simple rule, we've been here for three hours together and I've been watching and I'm trying to give you a simple route to affirm the statute of limitations, which I acknowledge after the 31-page SIR reply brief, we have a lot of ground to cover on that. And I'm trying to make our position straightforward on that point. And how would the claims process and a summary plan description resolve the statute of limitations question? Well, what it would do would be to say, we don't think that the description is adequate and complies with the statute. Marriott would take the position that it has, no, you're exempt because you are part of a select group of highly compensated management officials. And once that had been denied, we would then have our opportunity to go to court. Marriott made the argument below that we had failed to exhaust. Your point was that your clients never understood that there was a problem with the plan. It was. And that's a statute that would never run under your scenario. It would if the plan had been done properly. Many companies, when they set up these claims procedure plans, they provide their own contractual limitations period. Marriott ended up not doing that in 2010. But most companies administer these plans in a different way. What they do is they lay out the benefits. They lay out the procedures. They say when you can bring your claims administrator process. And then they tell you, if we deny your process, you should consult a lawyer and you have a right to go to court. And so Judge Diaz, had they done all of those things, our clients would have been able to exercise their rights presumably earlier because of their, the existence of a claims procedure. And all I'm saying is that this court's opinions have said that the claims under ERISA don't Leaving aside Judge Shedd's acknowledgement that there could be this clear repudiation standard, which can't be met on the facts of this case because, as even the district court acknowledged, the SEC prospectus was, quote, indecipherable legalese. If the court- Did the 78 prospectus say that the plan is unfunded and is exempt from participation, investing, funding, and fiduciary responsibility of the act? Did it say that? It said words like that, but what it didn't tell the recipients was that you are subject to a unfunded top hat plan and your investing requirements presumably are not going to vest the way. It was very opaquely worded in a way that would not have told the people, and we're talking about low-level people. We're talking about restaurant managers. We're talking about, you know, maitre d's. We're talking about low-level hotel and restaurant workers who are not going to read an SEC prospectus in those terms and understand what their ERISA rights are. But wait a second there. I thought that your clients in this case had that information in front of them. They all were sent this SEC prospectus, but the question- And I think the 1990 prospectus, by the way, that looks a little bit confusing, but the 78 doesn't look so confusing to me. Well, what the 78 doesn't do, Judge Shad, is it doesn't give you written objective criteria, which we believe is necessary in order to satisfy a test, and it doesn't notify people that they are being included within the statutory term of highly compensated or a select group of management. And so, therefore, you can't read that and discern what your rights are. Thank you. All right. Thank you very much. Next up is Mr. Ellis. Thank you, and good morning. Good morning. May it please the Court. My name is David Ellis, and I'm here on behalf of the United States Secretary of Labor. Since 1985, the United States Secretary of Labor has taken the consistent position that a top-hat plan may only include participants who are either management or highly compensated, and more specifically, may not include rank-and-file workers. This position is supported by all the traditional tools of statutory construction. First, the language of the statute, and in particular, the fact that the term primarily is best read to modify the phrase immediately following it, and not the more distant phrase that begins with select group. In fact, reading primarily to modify select group would be in conflict with the term select group, as select group is clearly a term of exclusion, and reading primarily to weaken the term select group would be in conflict. In addition, the tool of statutory construction by which we read statutory language consistent with the purpose of the statute, in this case, the purpose of ERISA and the primary purpose is to secure the benefits, in particular, the retirement benefits of Americans. To this end, Congress passed ERISA and included within ERISA clear procedural and substantive protections. These include funding, participation, vesting, and fiduciary protections. To read ERISA to exclude and strip away these protections for rank-and-file workers would defeat the purpose of ERISA, and in particular, it would take away key protections that workers have and have the right to and deserve to a secure retirement. Can I ask you, and you sort of addressed this in your brief, but I just want to discuss it with you a little bit more. On your reading, these plans have to be maintained exclusively for the benefit of these qualifying employees, right? Not primarily, but exclusively. Correct. Okay. Then what do we do with cases where maybe the criteria for inclusion is slightly overbroad, so you've got like 500 people in a plan, and really some judge comes in and says, well, 490 of them seem like they qualify to me, but 10 of them don't. I mean, is the entire plan then invalid, and there's this huge payout to 490 people who really were no harm done to them? I think one of the reasons primarily seems sort of attractive is because it takes care of what you might think of as sort of the de minimis violation case, but what's a better way to take care of it in your view? Well, in our view, as we addressed in our brief, that's a matter of remedy. So yes. The plan's invalid. The plan is invalid. However, the district court judge has broad remedial powers as a matter of equity to fashion the appropriate remedy. In your position, you're not taking any position on what that appropriate remedy should be in her hypothetical? As we pointed out in our brief, in instances where there is a very small amount of ineligible workers or where the employer perhaps has a good compliance regime and has good faith reasons for supporting that, that comes down to remedy. So in that instance . . . You said that. We're saying what is the remedy it comes down to in your opinion, or do you not care to speak about that? I'm not here to . . . I'm not in a position to speak to the particular remedy in this case. Certainly, on the facts proffered by the plaintiffs and . . . I didn't say in this case. I said in such a case where there's a one, two, three people out of 500 that shouldn't be in the plan. Your remedy would be what? Under those facts, where there's a very small number, and let's say that every other fact is a mitigating factor suggesting that . . . Your remedy would be what? At that point, then, the remedy . . . one remedy might be plan reformation. That would be one equitable remedy. However, certainly under . . . if we're not speaking about the hypothetical and if we're speaking about the facts in this case, drawing all inferences appropriately in favor of the hypothetical in this case. What would . . . because that was my next question, so what about in this case? In this case, well, the district court judge would certainly have wide latitude to fashion the appropriate remedy. I can't speak specifically to what that remedy would be, but . . . There's one there, that's your position. Yes, sir. There is . . . there would be a remedy, and certainly for non-qualifying plaintiff participants, they should be entitled to all of . . . to be made full for the harm that they've suffered under ERISA and for the stripping away of their key procedural and substantive rights under ERISA. However, I'm not in a position to point out this. What in particular the remedy would be? What's the value of a key procedural right if they don't have some substantive violation? What's the value of that exactly? Well, that would be up to the district court judge. But certainly if a participant doesn't have vesting rights, I mean, that would be an instance where you could clearly quantify what that would be. If they lack key fiduciary protections, that would be something that would perhaps would be more of a qualitative determination. So I see . . . Thank you very much. All right. So if I may briefly conclude, we respectfully request that this Court reverse the district court's finding that a top hat plan may include ineligible participants. Thank you. Gotcha. Thank you very much. Mr. Poston? Thank you, Your Honor. May it please the Court, Jeff Poston on behalf of Marriott. I want to address both the top hat plan issue and obviously the statute of limitation issue. But I thought it might be helpful just to start off with some basic facts. Marriott, between 1976 and 1989, offered two categories of . . . You seem to be a little bit loud, too. I'm sorry. I don't know if that's just me. That's probably just me. You might want to back up. I'll back off a little bit. Offered two categories of benefit plans, both of which are addressed in ERISA and I think both of which are relevant to our discussion today. First, Marriott provided very broad-based pension and welfare benefits to the bulk of its workforce. Plans like qualified retirement plans, health insurance, and those plans would have been offered to restaurant cashiers all the way up to Mr. Marriott and, in fact, the appellants in this case, Mr. Bond and Mr. Steigman. Those plans were subject to all of ERISA's substantive requirements, including the vesting requirements. In addition, for purposes of today, Marriott had a management incentive program, the Top Hat plan. This was an unfunded plan, the purpose of which was to provide deferred compensation through deferred stock bonus awards to a select group of management to reward them for good company. Marriott selected the managers and the managers that participated in this management incentive program through a four-step process that Judge Titus concluded was a rigorous process. And you were not even considered in that process unless you were a manager. And what that process yielded was less than 2% of Marriott's workforce ever received these deferred stock bonus awards and less than 20% of Marriott's managers ever received them. I did look at, very carefully, at sort of this four-step process, so let me ask you a hypothetical. First, let me tell you my concern, that I see how the process selected. What I don't see is that it selects for the criteria that ERISA makes relevant. It seems like it selects based on, did you do a really good job, it's a performance bonus, and how important, what was the financial importance of your position to the operation? So let me give you the hypothetical that concerns me, maybe not this exact one, but something like it. So how is this different from a law firm that says, first, we're going to call our paralegals case managers, and we have a good reason to do that. It's good for morale, we think the work they do is very important, they're case managers. And now, we have a special bonus program for the 20% of them that do the best work on the matters that are most important to the firm. That seems to me to exactly track Marriott's program. Would anyone in the world think that this special plan for law firm paralegals is a top-hat plan? Well, I can't answer for everybody in the world, but I can say, I can say, Your Honor, that under the circumstances, as you have just laid them out, that is a very performance-based So is this. This is more than just- Steps three and four were that you had to be performing really well. Well, you did have to be performing very well, but what you were starting with here, there was a couple of components. The individuals that were considered and ultimately selected were managers. Well, so were mine. They're case managers. But these managers were, these managers, and the issue, really, what we're talking about here are the folks that were responsible for the operation of these standalone hotels and restaurants. They were responsible for the financial success of each one of those entities, and I think that's a little bit different than a case manager in a law firm. No offense to case managers in a law firm. But each of these restaurants- But again, is it different in a way that's relevant to ERISA, where their purpose is to find people who have the kind of status within the organization that can serve as a proxy for kind of bargaining power? Because then they seem, you know, sort of standalone managers at one individual Marriott in California as compared, you know, in terms of their influence over upper management seem pretty comparable to a very highly valued paralegal in a law firm. Well, Your Honor, I guess where I would respectfully take issue with that is because you've now injected the bargaining power component into this. I'm just trying to define manager in a way that's sort of important to ERISA. And I think that Congress used the word management. They could have used, as the appellants suggest, high-level, high-ranking, top-level corporate executives with bargaining power, but Congress did not choose those words. Congress chose a deliberately broad word, management, which I think signals that Congress did not intend to micromanage. Congress did not intend to impose a one-size-fits-all here. So in Marriott's case, which is the case I can talk about, is they had a very functional definition. And they obviously were not providing these awards to every single manager, because 80 percent of their management force... The performance requirements were pretty strict. Well, there was the performance... I wouldn't expect 100 percent of the managers to hit the target. Right. But these... Just to sort of distinguish this, I think, a little bit from your example, these managers were responsible for standalone businesses. So if you just think of a hotel or a restaurant as a standalone business, and let's talk about Mr. Bond and Mr. Stogman, I think they're very good examples. They were both general managers of very large hotels. At the end, right? At the end. When they first came into the plan, what were they doing? At the end. And they and their management team, which is about seven or eight people per hotel, were responsible for the success, the operation, and the financial performance of that standalone hotel. In each instance, both Mr. Bond and Mr. Stogman had about 500 people reporting to them. They were the highest paid individuals there. And so I don't think... And if I'm not, I apologize. I'm just trying to... Yes? I have a question for you. Sure. You apparently don't think you can win on the statute of limitations. I do think I can win on the statute of limitations. And why in the world would you start with the arguments you're making to talk about who managed how many people in what place, and what they started with, and what they ended with, the top 2%? Why in the world would you... I'm just asking. Well... To me, that suggests you think your statute of limitations argument, if you're right on that, you go right to it, don't you? Your Honor, the statute of limitations decision is a threshold decision, and the answer to your question is... Okay. Let's go right to it. Let's go right to it. Respectfully, we believe that Judge Titus applied... Tell us why you win. We win because the Cotter standard should have been applied and not the Rodriguez standard. What is the Cotter standard as it applies? The Cotter standard applies where there has been no administrative claim submitted and there has been no administrative denial. And the reason is because if you didn't have something that applied in that point, the statute would... In the Cotter case, isn't it true that there was an individual who knew specifically he had not been getting benefits that he was entitled to, benefits he was entitled to? That seems a little more akin to denial of benefits than just put your own notice early on that we're not vesting. You understand the distinction I'm drawing? I think so. I think so, and if I don't, I'm sure you'll let me know. Unlike in the Cotter case where there was what we'll call a eureka moment at this deposition, there were a series of events, a series of reoccurring events that specifically told these appellants... What are they? They are first... Tell me the first one and why you think that we should use that as a statute of limitations. I thought I was asking the same question of the other side, and they were talking about how much you knew and you couldn't understand your rights. I don't think you understood my question, and I hope you will. I don't think you have to understand all your rights if it's an inquiry-type notice. You may have reason to believe you're injured, and you better get to figuring out what it is. And let me jump right to something that I think will answer your question, then I'll go back and I'll give you the full litany, because I think you were asking counsel about the prospectus, and you were indicating... Why don't you just answer it? This is what Mr. Bond was asked at his deposition about the very same paragraph that you were asking counsel about in the prospectus, where it says the vesting requirement of ERISA does not apply. Question to Mr. Bond. Let me stop and interrupt you. Sure. I've looked through their complaint. Isn't their complaint largely a claim that their rights didn't vest? Isn't that their claim? Their claim is that this is an illegal plan under ERISA, and it should not have been a top hat plan. And if it weren't a top hat plan, the vesting periods would have been much shorter. Yes. So this is what Mr. Bond was asked specifically about that vesting language in the prospectus. Don't you think that pretty much tells the reader that Marriott is not going to give anyone under the plan ERISA vesting? Answer. Yes. And that was at Joint Appendix 505 and 506. You combine that with the fact that he received this information in 78 by his own admission? He received a prospectus in 1978, 1980, 1986. You want to go to the first date, though. That's right. And in addition, he received stock certificates, because this was a stock plan. And the stock certificates laid out the vesting schedule. In addition, each year, all of the participants in this plan made a conscious decision, a conscious choice, whether to take the deferred stock bonus awards with the longer vesting period, or the pre-retirement awards with the much shorter vesting period. So each year, they were confronted, and each year, they made a choice between a longer and shorter vesting period. In addition, each year, they got a statement of benefits. And that statement of benefits told them how many had been awarded and how many had vested. That's all in isolation. How does that score? How do you reconcile that with the contrast between that vesting and the others who might be vesting? I mean, don't you need to know that you're being treated differently in order to assess whether or not you have a claim? Well, I think that's exactly what the prospectus said. The prospectus said, this is exempt from the vesting requirements. Well, Judge Titus, who's certainly not a simple man or a layperson by any stretch of the word, said, I don't understand what that means. Well, and Your Honor, Judge Diaz, this is what goes back to what I just read from the transcript, because obviously, Mr. Bond clearly did understand it, because he admitted that he understood it under oath. So we think the evidence here is at odds, respectfully, with Judge Titus's conclusion that this was legalese. That prospectus flat out said, it's unfunded, it's deferred compensation, it goes to a select group, and it's exempt from vesting. That's pretty clear language. Well, it's actually less important what it says, to some degree, but what the plaintiff in the case said, he thought it to be, I think. So your argument is, you think it means that, and whether everybody thinks it means that or not, he understood it to mean that. Is that your argument? Well, my argument is, the language is plain, and Marriott was informing these people of the fact. I know that's your argument, but isn't it a strong argument if not only you say it, give them notice, but he says, I got no notice. Yes, Your Honor, I think that's right. And I think that's exactly what Mr. Bond was testifying to in that exchange. I think that's right. He said, he was asked, with respect to the same vesting requirement that we're talking about, he said, the question was, don't you think that pretty much tells the reader that Marriott is not going to give anyone under the plan a risk of vesting? Answer, yes. So we think that's pretty plain. In addition to all these other... That takes the admission. Oh, go ahead. Actually, I just, I have to admit, I haven't looked at this part of the deposition. I assume you cited it in your brief and everything, but what's the context, and does he also understand like he's in the plan, he is part of an... Tell me what's right or wrong. So the context of that particular question was, I believe that the 1978 prospectus was in front of him. The page six paragraph that's titled ERISA was what he was focused on, and they went through each of the components of that paragraph and got to the last line where it says, this plan is exempt from ERISA vesting requirements, which it does say in the paragraph. And Mr. Bond was asked specifically about that last phrase, about vesting requirements, and that's what this exchange was. Right, and he had also indicated, and I understand that means me. Somewhere around there he says, I understood, I was not getting, when I saw this, I knew I wasn't getting my ERISA vesting rights. Well, he's saying that in his deposition, that's correct. That's what he's saying. Well, he knew or should have known. I doubt that he knew back then. Well, here is what they both testified to. They were given this document, they were given the prospectus, and they both testified that they didn't read it. Oh, so he's... Okay. So, which... And they have to? Under your view, an ERISA claim... Well, yes. American... American's rights has to read, what is it, like page six of the stock prospectus? Right. Mary, I... You know, I hope this isn't a bad analogy. We can only take the horse, you know, so far, and we can only provide this information. We can't make them read it. The stock prospectus? I mean, isn't it supposed to come in the form, it doesn't ERISA require, like a whole, like disclosures that are written so that a layperson can understand? I mean, isn't there supposed to be an ERISA disclosure for a stock prospectus? Well, yes. So there was discussion about the summary plan. I know. I'm bringing it right back to it, right? I'm sorry. Yeah. The summary plan description, which, by the way, would have mirrored this language. But Top Hat plans has... I mean, isn't the point you'd be more likely to read it if you were worried about your ERISA rates? You know, I can't attest to what people are more likely or not likely to do. All I can say is that if they... No, no. You can certainly make the point. You think somebody's more likely to read it if the letter's sent to them or if it's buried somewhere in the stock prospectus. You don't want to answer... No, I'll answer that. You're not qualified to answer that question. I'm happy to answer that because a summary plan description is a lengthy document. Everyone gets them. They all describe your health data. But the important thing here is that for Top Hat plan participants, there was no need... There's no requirement to provide a summary plan description. But the summary plan description with respect to this plan would have said exactly what the prospectus said. And I do think... Does this present perhaps a jury issue with respect to notice? No, Your Honor. Because not only did they get stock certificates that told them all this, multiple prospectuses that got all this, had to sit down each year and make the selection between deferred stock bonus and pre-retirement awards. The thrust of their argument at the district court and today is there's too many people in it and there's the wrong people in it. That is the thrust of their argument. Well, these two appellants knew how many people were in the plan and they knew who was in the plan. The 78 prospectus laid out that there were 1,300 recipients in the plan as of 1978. But I don't understand. What argument are you making? I am making that they were on notice of all of the facts. The argument about how many people were in it all had nothing to do with whether or not these specific people got notice or some kind of notice. Well, Your Honor, I would disagree with that. And here's the big picture. All of the facts relevant to this case occurred between 1976 and 1989. Both Mr. Bond and Mr. Steigman testified that they learned nothing new in the 25 years between the time they left Marriott and the time they filed a lawsuit in 2010. The factual challenge that the appellants have made to this top hat plan is that quantitatively there's too many people in it and qualitatively the wrong people are in it. That's their challenge. These two appellants knew that as of 1978. They knew how many people were in the plan and they knew they were in the plan. The appellant's argument is that... That's the statute of limitations of the challenge to the top hat plan and not to that they would not get benefits. Which is it? It is a statute of limitations argument because they were then on notice. If their point here is this is not a proper top hat plan and the reason it's not a proper top hat plan is because there's too many people in it and you have hotel managers like themselves, which is their argument. But also the tennis pro and the route driver, right? Did they know about them? Well, I don't know. So let's talk about what I'll call these outliers. If I could just finish that point. The point here is that the appellants are making is if you have restaurant or hotel level managers, that those aren't high enough. Even though they're managers. In fairness, that's one of their arguments. That's one of their arguments. And even though both Mr. Bond and Mr. Seidman have admitted these people were managers, all their experts admitted they were managers. The appellant's argument is these people weren't high enough. These appellants knew they were in the plan and they've both testified that every other individual that they are aware of who received these awards were managers at these local restaurants or hotels. What they didn't know was the legal significance of those facts. And your position is they don't need to know that. And that is the Kubrick, that is the Supreme Court's decision. You are on notice when you know the facts. What Kubrick said was you are no longer at mercy to the defendant at that point. And at that point, it is incumbent upon you to exercise due diligence and seek legal advice. And here I think it is very important that they filed a lawsuit. They filed a lawsuit in 2010. This kind of goes to the claims procedure issue. They filed a lawsuit in 2010. They didn't need a claims procedure to file in 2010. They didn't need one to file back in 1990. And I think this goes to the question that you asked, Judge Diaz, which is this type of claim, challenging the legality of a RISA plan, of a Top Hat plan, is something that's not susceptible to a claims procedure, which is run by a fiduciary charged with understanding the terms of a specific plan, not the legality of the plan under RISA. Did you not argue below that they should have exhausted by going through the claims process? Is that wrong? So that is correct, but it was a different claim. The original claim did challenge, made a benefit challenge. And interestingly, at that point, that was more of an exhaustion claim. We did not, and in fact, the appellants were using the Smith v. Sidner case in that context to say exhaustion was not necessary. This is a different claim, because as the claim evolved, it then became a challenge to the legality of the plan. And the Smith- It's like they're so intimately related, right? You want your benefits. The reason you're not getting them is because you're in a Top Hat. I just, it's hard for me to make that- Well, and I'm out of time here, but just one response. I want to make very clear factually, they were, the appellants and all the members of this plan, were provided every single benefit they were ever promised and every single benefit they've ever earned. What they're asking for now is additional benefits that they weren't promised or earned. Thank you. Thank you. Thank you very much. I think you actually saved a minute for the end here, maybe. Mr. Frederick? Judge Shedd, we have looked and we have not found a single case that holds a claim time barred under ERISA in the absence of a claims process and a summary plan document. Not one. So if you were to hold our claims time barred, you would be making new precedent. That wasn't necessary in Cotter, was it? What the court's first- Was there a summary plan statement that was in any way essential to the Cotter claim? There was, the point here is that we- No, I'm just asking you that question. The court didn't hold the claims time barred in Cotter. The court said that the claims were timely in Cotter. That was the holding of the court. So there's not a case that holds the claims time barred, Judge Shedd. Was the summary plan at all in play in Cotter? We always seem, I don't recall whether it was in play, but what was absolutely clear was that the court's holding was that the claims were timely. In Rodriguez, Judge Wilkinson wrote, Formal denial is the rule for a cruel. To hold otherwise would require lay participants and beneficiaries to be constantly alert for errors or abuses that might give rise to a claim- No, you don't agree that to us. We know the case. Cotter, but Cotter followed along behind that and realized there's an issue with that, didn't he? And then White held, subsequent to Cotter, that the formal denial rule is, quote, the plain and unconditional rule of this circuit. Kefauve followed the D.C. circuit case that says, We're not going to apply this inquiry notice standard that's sort of generally applicable under discovery because ERISA is different. ERISA imposes obligations on companies to give information- Do you think the law, undisputed in this circuit is, no cause of action time runs until you file for benefits and are denied? That's correct. That is what White and Rodriguez hold. And if you apply them here, they conceded that below by arguing we had failed to exhaust. And they have waived their argument now that there is a clear repudiation standard because what they argued below was that our case should have been dismissed for failure to exhaust. Even in a case when the company goes, This is not an ERISA plan. Even in a case where there's not an ERISA plan. And I acknowledge, Judge Shedd, these are highly unusual facts. This is the most expansive top hat plan I've ever- Even when the company goes, This is not an ERISA case. This is not an ERISA benefit. Your position is, the statute on that claim, if you think you have a claim on something they said to you or promised you, that doesn't accrue until you file and are denied benefits under a system that doesn't exist under the company's position. Our position is that ERISA controls for the claim- That would be yes, then. It would be yes that this would be the rule. I acknowledge that this is a highly unusual case, but that doesn't mean you should discard the principles of notice, having a claims procedure in place, putting the burden on the company. It's the company's affirmative defense. And they have the burden to show that we had violated the timeliness of the claims. What do you make of the deposition excerpt that was read there? It's taken out of context. This is a man who was deposed three years after the claim had been filed. He testified earlier in the deposition. He had no idea what that language really meant. And he was asked a series of leading questions that counsel respectfully has taken out of context in understanding what the gravamen of the claim was. Why was it out of context? What's the- Because if you look at the entirety of the transcript, he's explaining that he was in this fog and he really didn't understand until the lawyers had explained to him. In fact, you should have had more stock under ERISA because your claims would have vested- Under the statutory vesting. Is it a subjective test or is it a reasonable man test with respect to inquiry? If we disagree with you that inquiry is enough, notice inquiry. Well, that would be a big hurdle, Judge Diaz, because there's no case that holds inquiry notice under ERISA. But I would say even that we should win because it is an objective, reasonable person standard under any kind of these sorts of discovery type principles. But importantly here- No, no, no. You missed the point of his question. I think the point is at least at deposition he goes, yeah, that's what that language says. Well, now after he's saying that as a series of leading questions that is that- When you say we got you think they were leading questions, we're talking about his statement. I suspect- It's not as- Let me say this. I suspect everybody in this courtroom knows what a leading question is. Maybe you've seen a few. But the point is, the question is, is an objective standard if a person hypothetical to make it easier on you to take you away from the facts? Because you may not want to yield on your facts. But if a person says, I looked at that language, I had that language, I didn't read it, but if I had read that language I would have understood I had no rights. You would think that would be the start of the statute of limitations. You don't think that. No, I think that- I actually think that you would look at it somewhat differently because it is an objective standard. And whether or not one person might have had greater sophistication would not bear on- No, you wouldn't think that because he hadn't filed for benefits. That's right. Under the law of this circuit, so we're actually into the third layer of arguments here, Judge Diaz. But on the inquiry, if inquiry notice were enough, you'd think that that would be a reasonable person standard that would give a person notice. And that's why actually Judge Titus in his long written statute of limitations ruling says that the prospectuses really weren't giving notice to the kind of low-level employees that we're talking about here. Bariat should not be rewarded for decades of violating ERISA. And that's what their statute of limitations argument asks for. And that's what their exemption under the Top Hat plan asks for. Thank you. Okay, thank you very much. Mr. Poston, I think you have a minute. No, I'm done. Unless you have more questions. I think Mr. Poston has a moment. Oh, sorry. I have one in my room. Maybe y'all can stand there together if you like. Thank you, Your Honor. Just a couple things, and I'll try not to be too repetitive here. On the summary plan description issue, there is no requirement under the law that Top Hat plan participants be given a summary plan description. This is something that is part and parcel of the broad-based pension and welfare plans. And the same is true with claims procedures. How about I do this? Make, in 30 seconds, make your best argument, statute of limitations argument, at the earliest points you think you can make it. In the 1978 stock prospectus, in that document, gave a person notice. In the 1978 prospectus? Yes, it did. What's the other thing? You said something about their annual statements. There's a different statute of limitations argument you were making, I think. They should have known, based on that annual statement, that this would violate a Top Hat plan. That's correct. They got an annual statement each year that showed the discrepancy between awarded shares and vested shares. And they have both testified that they learned nothing new from 1990 through 2010. At any point in that interim period, they could have raised their hand, or filed suit, or made a complaint, and they failed to do so. So thank you. Thank you very much. Thank you. We will now adjourn court, step down and greet counsel. Mr. Honorable Court, we stand adjourned until tomorrow morning. God save the United States from this honorable court.
judges: Dennis W. Shedd, Albert Diaz, Pamela A. Harris